# Richmond

## Marion D. Moore v. Commonwealth of Virginia.

June 9, 1947.

Record No. 3101.

Present, All the Justices.

The opinion states the case.

*R. I. Overbey* and *Royston Jester, Jr.,* for the plaintiff in error.

*Abram P. Staples, Attorney General,* and *W. Carrington Thompson, Assistant Attorney General,* for the Commonwealth.

BUCHANAN, J., delivered the opinion of the court.

The defendant below, Marion D. Moore, was indicted for the larceny of seventeen fifths of whiskey from O. C. Wilburn. There were three jury trials, the first two resulting in disagreement, and on the third he was convicted and sentenced to two years in the penitentiary.

On this writ of error, allowed to that judgment, he asserts that the trial court erred in refusing to set aside the verdict

as contrary to the evidence, in refusing a continuance, in admitting improper evidence, in making certain prejudicial remarks before the jury, and in refusing a new trial for after-discovered evidence.

The defendant admitted having possession of the whiskey. He claims he bought it from Wilburn; the Commonwealth claims he stole it, and that was the issue before the jury.

The case made by the evidence for the Commonwealth was essentially this:

Wilburn, who lived in Alexandria, left Washington on February 9, 1945, with two cases of whiskey in which there were twenty-two bottles known as "fifths," in the trunk of his automobile. In the car with him were a brother and sister, brother-in-law and sister-in-law and a friend. They arrived at the home of Wilburn's mother in Charlotte county about two o'clock next morning, where they expected to spend about a week and do some work on her farm. Wilburn said he expected to exchange work with neighbors and to give each man who helped one of the fifths of whiskey.

Wilburn stayed at his mother's until about the middle of the following afternoon, which was Saturday, February 10, and then left the other occupants of the car there, and alone drove to Appomattox with the whiskey still in the car. At Appomattox he gave away one of the bottles of whiskey and gave a drink to several friends. From Appomattox he drove to the defendant's place of business, which seems to have been a combination filling station, restaurant and place of entertainment on the road between Lynchburg and Rustburg. He got there between eleven and twelve o'clock that night. The place was closed and the shades were drawn, and when someone came out he went in. He had known Moore for some time.

Inside there seemed to be around ten or twelve people, but Moore and his wife and Harvey Wilson and his wife were the only ones he knew. Everybody was drinking and seemed to be drunk. Wilburn had had a drink at Appomattox and another before going into Moore's. Moore asked

him for a drink and they went out to Wilburn's car where he gave Moore a drink and one of the bottles of whiskey, and carried another back into the filling station, placed it on the counter and everybody who wanted to drank out of it.

Wilburn stayed at Moore's until one-thirty or two o'clock Sunday morning, and then he had Harvey Wilson, whom he had known for six or seven years, drive him in Wilburn's car to Lynchburg, a few miles away, to see a friend of Wilburn's. They did not find him and drove back to Moore's, arriving about 2:30 a. m. Wilburn slept most of the way back. Wilson stopped Wilburn's car in front of Moore's place. There Wilburn told Wilson he was tired out and sleepy and was going to take a nap in his car before he started back home. Wilson turned off the motor and either put the keys in Wilburn's hand or laid them on the seat by his hand, but Wilburn did not put them in his pocket.

In the meantime, Mrs. Moore and Mrs. Wilson had driven in Wilson's car to Old Fort Hotel to arrange supper, which they expected to have later with their husbands. When Wilburn and Wilson got back from Lynchburg, Wilson and Moore talked to their wives over the telephone and a few minutes later the wives drove back to the filling station. Mrs. Wilson stayed in the car and Mr. and Mrs. Moore stood there a few minutes and talked to Mr. and Mrs. Wilson. During that time Moore went to Wilburn's car, took a bottle of whiskey out of the trunk and put it into his own car, which was then parked between the service station and the tanks. Shortly thereafter the Wilsons drove away and at that time the Wilburn car, with Wilburn asleep in it, was standing close to the filling station where Wilson had parked it.

When Wilburn woke up the next morning about daylight, his whiskey was gone, his pocketbook containing $720, which he carried in his inside coat pocket, was also gone, and he thought his car keys had been taken, but they were later found on the floor of the car by the sheriff. The whiskey had been taken out of the cartons and the cartons left in the

trunk. He immediately called the sheriff, who came with a deputy, Williams, to investigate. They knocked repeatedly on the door of the Moore residence, which was a few feet from the filling station, called loudly, blew the horn, and made all the noise they could to wake Moore up. They had almost given up when Williams discovered Mr. and Mrs. Moore in their automobile just back of the filling station, sitting so they could not be seen until he was very close to the car.

The sheriff told Moore that Wilburn's money and whiskey were gone and asked him if he knew anything about it. Moore replied that he did not know a thing in the world about it. The sheriff asked him what time he got in and whether he then saw Wilburn's car, which was sitting so Moore would have had to pull around it to get to where Moore's car was. Moore said they had come home about six o'clock that morning and Wilburn's car was not there then and was not there when they left at four o'clock. The sheriff got there about nine o'clock and Wilburn's car was there then, and in the same place where Wilson left it the night before. The sheriff then talked to Mrs. Moore and she made the same answers.

The sheriff then learned that Wilson and his wife had been with Wilburn and the Moores that night, so he went several miles to Wilson's home and brought him back to the filling station. They then spent about twenty minutes knocking on the door of the Moore residence, calling and blowing the car horns, without getting any response other than from a dog barking in the house. Finally the sheriff sent to Rustburg for a search warrant and after it had been brought back one of the officers rapped on the door hard with a blackjack. Mrs. Moore then came to the door fully dressed and in a few minutes Moore came out. The sheriff told them that Mr. and Mrs. Wilson said they left Wilburn between two-thirty and three o'clock that morning asleep in his car, which was then in the same place as it was when the sheriff arrived, and that nobody was there then except

Mr. and Mrs. Moore. Moore replied, "I don't know a thing in the world about it. I told you all I know about it." The sheriff then told them he had a search warrant and asked them to unlock or give him the keys to the house. When they started towards the house, Moore told the sheriff he would find a case of the whiskey in the house, but that he had bought it from Wilburn last night. The sheriff asked Wilburn if that was true and Wilburn replied that he had not sold, or offered to sell, a bottle of whiskey to anybody. Mrs. Moore then said, "Wilburn, you know that Marion gave you eighty bucks for that whiskey last night," and again Wilburn said that was not true. They then went into the Moore house and found seventeen fifths of whiskey and part of another sitting on the floor and not in the cartons. The sheriff said, "Marion, you told me you bought a case of whiskey. How about this other six bottles here? He never did explain that."

John Henry Robinson testified that he helped Moore take the whiskey out of Wilburn's car and carry it to the house. Raymond Karnes testified he saw them take it. Eddie Robinson, brother of John Henry, and who was still working for Moore at the time of the trial, first testified he did not see them take the whiskey, but later sent word to the Commonwealth's attorney that he wanted to correct that statement, and he went back on the stand and testified that he did see them taking it.

Mr. and Mrs. Moore undertook to explain their statements to the sheriff by saying the sale was a transaction between friends and they did not want to get Wilburn into trouble. They testified that Moore bought a case and a half from Wilburn and paid him $80 for it before Wilburn and Wilson went to Lynchburg; they denied the testimony of the Wilsons in all its essential parts and denied that they ever saw Wilburn and Wilson again after they left for Lynchburg. They stated that Wilburn's car was not there when they left about four o'clock in the morning to take Farrar, one of their witnesses, to Lynchburg; that they got back from

Lynchburg about six o'clock, while it was yet dark; that Mrs. Moore turned on the car radio and then went to asleep while Moore read a newspaper by a dash light and that was why they did not hear the sheriff on his first trip to the house. Farrar testified that he saw Moore paying somebody in the filling station some money that night, but did not know who it was or what it was for. The defendant introduced evidence to impeach John Henry Robinson and Karnes, and to prove that Wilburn was offering to sell whiskey, and did sell a bottle to each of two sailors.

The argument that the verdict was contrary to the evidence is in reality an argument that under the facts and circumstances of the case the jury should have accepted the defendant's version that he obtained the whiskey by purchase and not by theft. But those were matters for the consideration of the jury. The jury saw the witnesses and heard them testify and were the body best able to sift the truth from the welter of conflict. They have determined that the truth is in the Commonwealth's evidence. They had a right to believe that and the evidence of the Commonwealth is ample to support their conclusion.

It was not error to refuse defendant's motion to continue because of the absence of two witnesses. They were the sailors to whom it was claimed Wilburn had sold a bottle of whiskey that night at the filling station. They were in the navy, and in making the motion defendant's counsel stated that he thought it was reasonable to expect them by the next term, but of course he could not tell. He filed his own affidavit stating that "judging from a postal received by defendant from one of the parties and word from the mother of the other party, the affiant has reason to believe that their testimony will be available in the near future." The postal card was not offered and the mother did not testify. After the trial, counsel asked leave to file the affidavits of the two witnesses stating they had bought whiskey from Wilburn on the night in question, but the court refused.

In ruling on the motion, the court recalled that after the first hung jury the case was set for retrial, and at the

appointed time counsel for the accused asked for a continuance because of the absence of a material witness who was in the armed services and they had reason to believe would be present at the next term; that the trial was thereupon postponed to a later date, but the witness was still absent and it was agreed to go ahead with the trial on July 26, on which occasion there was a second hung jury; that neither of the two witnesses now absent was present or summoned at the two former trials; and that, after having heard the evidence in those trials, the court did not consider their evidence material, but even if material, the witnesses were beyond the jurisdiction of the court and no one could say with reasonable certainty when their evidence could be secured.

A motion for a continuance is addressed to the sound discretion of the trial court and its action thereon will not be reversed unless it is clearly shown that the court abused its discretion and that injury resulted. The expected evidence must not be purely cumulative and where the witness is beyond the reach of process there must be reasonable assurance that he can be produced at the next term. *Willis* v. *Commonwealth*, 183 Va. 125, 31 S. E. (2d) 306; *Rosenberger* v. *Commonwealth*, 159 Va. 953, 166 S. E. 464; *Wallen* v. *Commonwealth*, 134 Va. 773, 114 S. E. 786. Here there is not a sufficient showing of abuse of discretion to warrant reversal on that ground.

Error is alleged to have been committed in admitting in evidence two photographs of the filling station. The pictures were taken several months after the alleged larceny occurred. The point of the objection is that the pictures showed not only the filling station and permanent objects around it, which was unobjectionable, but also a movable object, Wilburn's automobile, which was placed there just before the pictures were made. Wilson was present when the pictures were taken and the car was placed at his direction. He, his wife and Wilburn testified that the pictures correctly showed the position of the car that night. The only purpose they served was to help the jury understand the testimony.

Defendant does not contend that the pictures do not show the car where the witnesses said it was. He contends that it was not there at all. The place where the car stood was wholly immaterial. The question was whether the defendant stole whiskey out of it, not the exact spot it was in, when and if he did.

In cases where the position of movable objects is material, there is a conflict of authority on the question whether it is proper to place them on the scene afterwards and then introduce a picture of the result. Cases on both sides of the question are collected in a note in 27 A. L. R. 913. Wharton says such photographs are admitted in most jurisdictions when proper foundation has been laid. Wharton's Criminal Evidence, 11th Edition (1935), Vol. 2, sec. 776, p. 1329. And see Wigmore on Evidence, Third Edition (1940), Vol. 3, sec. 798, p. 201. Courts holding such photographs inadmissible have generally done so on the ground that they were self-serving, or placed undue emphasis on one side of conflicting testimony and there was danger they would be accepted by the jury as a view of the actual occurrence. See *Nunnelley* v. *Muth*, 195 Ky. 352, 242 S. W. 622, 27 A. L. R. 910; *Fore* v. *State*, 75 Miss. 727, 23 So. 710. No possible injury to the defendant could have resulted from the introduction of the photographs in this case and the assignment of error thereto is without merit.

Error is assigned to remarks made by the court in the course of the trial: Harvey Wilson, witness for the Commonwealth, on direct examination had stated that when he and his wife left the filling station John Henry Robinson and the little crippled boy (apparently Karnes) were playing out next to the fence on the Lynchburg side. He had been vigorously cross-examined on this statement and had said that the distance from his car to the fence was at least 15 or 16 feet. On re-examination he said he was referring to the fence on the Rustburg side and that from his car to the fence where the boys were might be 35 or 40 feet, he did not know. Defendant's counsel was proceeding to re-cross-

examine him on what fence he had referred to when the court interposed as follows:

"Ask the witness a question that is material. I think you are getting a little off the track. I'd like to see you get to the issue of whether or not this man stole the whiskey or not. You have gone downtown. What's that got to do with whether he stole the whiskey or bought the whiskey? You have admitted that he got the whiskey. You claim that he bought it. The Commonwealth claims that he stole it. Now, that is the issue. You have gone way downtown. Why take all this time going over those details? Let's get down to the issue here, gentlemen. Go ahead and ask him any questions that are relevant but you are going too far afield. The jury wants to know whether this man paid for the whiskey or stole it."

The defendant thereupon moved for a mistrial, which the court refused, but allowed defendant's counsel to proceed fully with his cross-examination on the point. Defendant says those remarks by the court were calculated to cause the jury to believe that the court believed that the defendant was trying to evade the issue, and were highly prejudicial to him. We do not gather that meaning or effect. It was a blunt, but accurate, statement of the issue, and about all it indicated was an impatience with counsel for re-cross-examining on what the court considered an unimportant detail.

Patience is a virtue that well adorns a judge, adds to his respect from bar and public, and aids in creating an atmosphere becoming to a forum where men bring their disputes for judicial determination. But, as we said in *Parsons* v. *Commonwealth*, 154 Va. 832, 152 S. E. 547, while impatience is regrettable, judges continue to be men and do not cast aside all human imperfections when they ascend the bench. To warrant reversal, their error must be more than mere impatience; it must be of such character as to result in prejudice and prevent a fair trial. It would be that kind, of course, if it caused the jury to become prejudiced against the accused, or influenced them in weighing the evidence. We

do not believe the remarks of the court in this instance had, or could have had, that effect.

The final assignment of error is to the refusal to grant a new trial for after-discovered evidence. The evidence offered was the affidavits of four boys, three of them sons of C. E. Kidd, who had testified for the defendant in an effort to impeach John Henry Robinson. Their affidavits were that they had met John Henry in the road near the filling station in August, before the last trial in September, and he showed them where Raymond Karnes had buried Wilburn's pocketbook, which he said Raymond had got on the night of the trouble, had taken some money and papers out of it, offered him some of the money which he did not take, and then Raymond had buried the pocketbook with part of the money in it in a hole which he dug with a pick he got back of the filling station. The Commonwealth filed counter-affidavits denying all this.

■ ■ In view of the temptations involved, motions for a new trial for after-discovered evidence are not looked upon with favor. *Holmes* v. *Commonwealth*, 156 Va. 963, 157 S. E. 554; *Pauley* v. *Commonwealth*, 151 Va. 510, 144 S. E. 361. The evidence relied on must, among other things, go to the merits, and not merely impeach the character of a former witness. *Thompson* v. *Commonwealth*, 8 Gratt. (49 Va.) 637; *Powell* v. *Commonwealth*, 133 Va. 741, 112 S. E. 657, 33 A. L. R. 541.

■ The evidence offered here does not meet the requirements. If believed, which is unlikely, its only effect would be to discredit Robinson, and it would be wholly cumulative. There was no error in refusing a new trial for that cause.

We find no prejudicial error in the trial and the judgment is

*Affirmed.*