COURT OF APPEALS OF VIRGINIA

Present:  Judges Humphreys, Felton and Kelsey
Argued by teleconference

ELDRIDGE FRANK VIA, S/K/A
 ELDRIDGE FRANK VIA, JR.

                                                    OPINION BY
v.       Record No. 2018-02-3          JUDGE ROBERT J. HUMPHREYS
                                                    JANUARY 13, 2004
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF AUGUSTA COUNTY
Thomas H. Wood, Judge

Craig S. Cooley (Law Office of Craig S. Cooley, on brief), for
appellant.

Leah A. Darron, Assistant Attorney General (Jerry W. Kilgore,
Attorney General; John H. McLees, Senior Assistant Attorney
General, on brief), for appellee.

Eldridge Frank Via appeals his convictions, after a jury trial, for sodomy, in violation of

Code § 18.2-67.1, and incest, in violation of Code § 18.2-366.  Via contends that the trial court

erred by:  1) "prompting and soliciting evidentiary objections from the Commonwealth" and

"berating and belittling defense counsel," while in the presence of the jury; 2) refusing to admit

relevant impeachment evidence; 3) refusing to quash the Commonwealth's subpoena *duces*

*tecum*, requesting records and information in possession of a defense expert; and 4) erroneously

applying the "Rape Shield Statute."  For the reasons that follow, we affirm Via's convictions.

I.  Background

"On appeal, we review the evidence in the light most favorable to the party prevailing

below, together with all reasonable inferences that may be drawn."  Benton v. Commonwealth,

40 Va. App. 136, 139, 578 S.E.2d 74, 75 (2003).

So viewed, the relevant evidence established that on October 22, 2001, an Augusta County grand jury indicted Via for "unlawfully and feloniously engag[ing] in cunnilingus with [L.V.], a child under the age of 13 years, in violation of [Code § 18.2-67.1]," and "unlawfully and feloniously having sexual intercourse with his daughter, [L.V.], a child at least thirteen years of age but less than eighteen years of age, in violation of [Code § 18.2-366]." The sodomy indictment alleged that the purported events took place between January 1, 1998 and September 1, 1998. The indictment alleging incest stated that the purported events took place between January 1, 1999 and August 4, 2001.[1]

Prior to Via's trial on these charges, the Commonwealth issued a subpoena *duces tecum* to Joseph C. Conley, Ph.D., requesting "any and all medical and counseling records, notes and exams and all information relating to [L.V.]." Via's counsel filed a motion to quash the subpoena, contending that Conley was engaged by Via as a defense expert witness "to test and evaluate [L.V.]." Thus, Via's counsel contended Conley's records were subject to the attorney/client privilege arguing,

> all communications to and with [Dr. Conley] were made because of the attorney-client relationship between the [d]efendant and his attorney, concerned the subject matter of the attorney's employment, and were communications made to the attorney's agent, said agent's ([Dr. Conley]) services being indispensable to the attorney's effective representation of the [d]efendant.

Via's counsel further argued that the records "pertaining to the minor child complaining witness" were subject to the work product doctrine and that they were not "subject to discovery by the Commonwealth pursuant to Rules of the Virginia Supreme Court, Rule 3A:11(c)."

---

[1] L.V. and her three siblings were adopted by Via and his wife when L.V. was ten years of age.

The trial court heard argument on the motion on January 29, 2002. Recognizing that there is no "physician/client privilege" in criminal matters, the trial court overruled the motion "with respect to any statements made to – anything in this that came from this child," the victim. Nevertheless, the trial court granted Via's counsel time to submit authority for the proposition that any statements made to Dr. Conley by Via would be "[in]admissible."

Both Via's counsel and the Commonwealth later submitted additional authority to the court, related to the motion to quash. Via's counsel contended that the Commonwealth was precluded from obtaining Dr. Conley's records, pursuant to Rule 3A:11, as well as the Fifth, Sixth and Fourteenth Amendments. Via's counsel again argued that the records were subject to the attorney/client privilege and the attorney work product doctrine because Dr. Conley was an agent of the defense and Dr. Conley's services were "indispensable" to her effective representation of Via. Via's counsel further argued that any statements made by Paula Via, Via's wife and the victim's adoptive mother, were also subject to the attorney/client privilege as she shared a "common interest" in Via's defense because the Commonwealth had "intimated" she may also face criminal charges. Finally, Via's counsel asked the trial court to reconsider its ruling with respect to statements made to Dr. Conley by L.V. After giving both parties the opportunity to argue the motion further, the trial court overruled the motion to quash the subpoena *duces tecum*.

Approximately one month prior to Via's trial, the Commonwealth filed a motion *in limine* requesting that Via's counsel be precluded from introducing at trial any evidence concerning "alleged prior sexual abuse of the victim, [L.V.]," as well as "other alleged sexual activity of the victim, [L.V.]." The Commonwealth based its objection on relevance and the Virginia "Rape Shield Statute," Code § 18.2-67.7.

The trial court heard argument on the Commonwealth's motion on February 25, 2002.[2] Via's counsel contended that because the incest charge did not fall within the ambit of Article 7 of Title 18.2 (prescribing criminal sexual assault), the "Rape Shield Statute" did not apply. Via's counsel stated that the evidence she intended to elicit would establish that L.V. made prior reports of abuse, directed at her birth father, as well as her birth mother's boyfriend. Via's counsel contended this evidence would tend to establish that L.V. knew how to make a complaint of abuse, and knew that making such a complaint would have the effect of "separating" her from the person she made the complaint against. Via's counsel stated she also intended to introduce evidence concerning L.V.'s alleged other sexual activity during the time at issue, as well as after her report of the abuse. Via's counsel argued this evidence would prove that L.V. had a motive to fabricate the complaint against Via. Specifically, it would lend support to Via's theory that L.V. fabricated the complaints against him with the intention of removing Via from the home, so that he could no longer restrict her from seeing her boyfriend.

The trial court ruled as follows:

> All right Ms. Gartzke [(Via's counsel)], I don't think evidence about what type of sexual activity that this child, when she was five years old, engaged in with her father or the boyfriend of her mother, is relevant. And I think it violates the "Rape Shield Statute." I don't think it's relevant.

> \* \* \* \* \* \* \*

_____

[2] During the hearing, Via's counsel also indicated that she was considering producing expert testimony from a psychologist in order to establish that "there is a psychological condition in which children who are adopted at that older age, end up – a high proportion of those children end up making sexual abuse complaints against their foster parents or their adopted [sic] parents." The trial court advised Via's counsel that it considered such evidence to be pertinent to the credibility of the witness, a matter that it explained was within the province of the jury. It encouraged Via's counsel to produce authority for her position, but advised that it did not "believe" expert testimony concerning an opinion of a witness' credibility would be admissible.

- 4 -

. . . If they . . . try to make her prior sexual history an issue in this case – if the Commonwealth tries to do that – then, you know there isn't much left of this "Rape Shield Statute" . . . .

* * * * * * *

. . . [I]f that suggestion ever gets – gets in here . . . what the child actually did would be admissible . . . .

Now the report is - is something entirely different, for a different reason. The fact that she reported it and got what she wanted, or . . . and I don't know what your evidence is going to be. And you're gonna [sic] have to put some evidence on that's going to make this admissible; the fact that she made a report and got this child – or these men excluded from her life, as a result of it, and she knows she can do that. It's all gonna [sic] depend on what kind of evidence you've got, as to why would she want to do that in this case.

* * * * * * *

All right. But I can't see how it's gonna [sic] be much voluminous evidence [sic], because you're not gonna [sic] get into evidence – what all went on in Montgomery County. You're just not. It's not coming in. But the – the fact that the report – she made a report and what happened thereafter, may be admissible, provided you – you establish a relevance [sic].

* * * * * * *

The [Rape Shield] statute does not apply to the incest charge.

* * * * * * *

With respect to the incest charge, there's very little that could conceivably be relevant to an incest charge about some – this girl's prior sexual history or subsequent sexual history. It just wouldn't be relevant. It's a question of whether or not he had sex with her.

So, you know, I want to caution you now . . . . [J]ust don't have somebody come in here and blurt out something that you know is not relevant.

In its written order of February 27, 2002, the trial court stated as follows, in relevant part:

2) The Rape Shield Statute (Sect. 18.20-67.7) [sic] does not apply to the charge of incest, but does apply to the charge of forcible sodomy; and

- 5 -

3) Evidence about the sexual activities of [L.V.] which occurred in Montgomery County, Virginia before she was adopted, are not admissible.

At the beginning of Via's trial, the trial court gave the jury "preliminary instructions." Specifically, the trial court admonished the jury that:

No statement, ruling, or remark that I may make at anytime during the course of this trial is intended in any way to indicate my opinion as to the facts of this case. No expression, look, or gesture that I may make should be interpreted by you as being indicative of my opinion.

Subsequently, L.V. testified that the Vias adopted her when she was ten years of age. She stated she was 16 at the time of the trial. L.V. testified that, after living with the Vias for several months, Via began to rub her chest and her "privates" when he would tuck her into bed at night. Sometime after that, Via began to sodomize L.V. and the two began engaging in oral sex and having intercourse.

L.V. testified that these activities continued for the next few years, even after the family had moved into a new home. At that time, L.V. had her own bedroom in the basement of the home. L.V. contended that the last time she had intercourse with her father was on August 4, 2001.

L.V. testified that she met with Dr. Conley and that she told him about the abuse. She conceded she told him that at times, after the abuse began, she would "ask [Via] for sex."

At one point during L.V.'s cross-examination, Via's counsel attempted to admit a photograph of L.V.'s bedroom into evidence. L.V. and her siblings appeared in the photograph. Without clearly setting forth the context, the record establishes that the trial court stated:

I'll mark it, what is it, I'll mark it A, photograph, I'll mark it Defendant's Exhibit A for purposes of identification. Are you just going to go on off or you going to object to it?

Counsel for the Commonwealth replied, "I'm not going to object to that picture, no sir." The

trial court then admitted the picture into evidence.

As Via's counsel attempted to admit other photographs, the following colloquy took

place between counsel and the trial court:

> [Counsel for the Commonwealth]: Show them to [L.V.]. See what
> she'll say about them. Judge, I, I don't know what the relevance of
> these pictures are. She's not denying being happy. These are . . .
>
> [Trial Court]: I can understand that, Mr. Reed [(Counsel for the
> Commonwealth)], but you've been sitting there for . . .
>
> [Counsel for the Commonwealth]: Well, I, you know, I . . .
>
> [Trial Court]: . . . been going on and on, she's . . .
>
> [Counsel for the Commonwealth]: . . . I'm trying to be
> accommodating but there are limits to how far we need to go.
>
> [Trial Court]: Ms. Gartzke [(Via's counsel)], I'm going to, if this,
> if this is what the purpose of these photographs is, I'm going to
> sustain the objection because she's answered that, she answered
> that 15 minutes ago, said she was happy except when [sic]. And I,
> and she's testified it hadn't, her unhappiness never showed or
> came out and I just think that's far enough. I mean, that's enough.
>
> [Counsel for Via]: Okay.

When asked whether she wrote about the abuse in her diary, L.V. stated that she

remembered writing "one thing." The Commonwealth then objected to the admission of L.V.'s

diaries based upon relevance, but noting that they may be admissible if Via's counsel were to ask

L.V. "something specific." Outside of the presence of the jury, Via's counsel responded that the

diaries should be admitted to show that L.V. did not write about the alleged abuse. Noting that

L.V. had already admitted this, and stating, "this is so much overkill, it's pathetic," the trial court

sustained the objection. The court further stated, "[i]f there's anything important in there, ask

her about it. Otherwise, it's just cumulative to the point of *ad nauseam*."

After the jury returned, L.V. testified that she had a boyfriend, Isaiah, during the summer of 2001 and that she saw him three times that summer. L.V. agreed that she talked with Isaiah on the telephone for hours, that they had talked about getting married, and that they had discussed names for their future children. L.V. stated that she "hid" her relationship with Isaiah from Via. L.V. further conceded that she was afraid Via would not approve of Isaiah.

When Via's counsel asked L.V., "You never even gave him a chance to find out you had any kind of relation . . . ," the Commonwealth objected, arguing that the question was "[in]appropriate." The trial court stated "Ms. Gartzke, what's the purpose of that last question? The first one, fine, the second one, what's the purpose of it[?] Don't tell me. I'm going to sustain the objection. Go ahead."

On re-direct, L.V. stated she never spent time with Isaiah unchaperoned.

On re-cross, Via's counsel attempted to introduce love notes written by L.V. and Isaiah, dated August 18, 2001 through September 5, 2001. After Via's counsel requested that they be marked, and again without clearly setting forth the context, the record reflects the trial court stated, "Well, you should let her know of your objection." The Commonwealth then objected, arguing relevance, and the trial court sustained the objection. Via's counsel responded that the contents of the letters were "absolutely relevant." After cautioning Via's counsel not to "raise [her] voice," the trial court dismissed the jury.

Via's counsel argued that there was information in the letters that contradicted L.V.'s statements that she "went out with [Isaiah] three times but she was never unchaperoned." When the trial court asked Via's counsel about the specific relevance of the letters, Via's counsel stated:

> It's the crux of our whole case, Your Honor. He did not know
> about it but she testified that she was afraid to tell him about it and
> the contents of those letters back up that she was afraid to tell him

- 8 -

because she had some total misconception that he would not allow her to see this boy and, and these charges are totally fabricated . . .

Although Via's counsel further claimed that the letters contained information concerning "things that occurred before August 18th," the trial court sustained the objection finding that "nothing that occurred with this young woman and any young man after August 18th is relevant to any issue in this case."

Janet Flavin testified on behalf of the Commonwealth. Flavin stated that she was working as a child protective services worker with Staunton-Augusta County Department of Social Services on August 18, 2001. She testified that she interviewed L.V. about her report of abuse.

On cross-examination, Via's counsel attempted to ask Flavin whether she followed a training seminar manual when interviewing L.V. The Commonwealth objected to the introduction of the manual on the basis of relevance. Via's counsel stated that the manual was relevant because it "contain[ed] information about how a child should be interviewed when abuse or sexual abuse allegations are going to become criminal offenses" and "much of things in this book were not followed by [Flavin] when she initially interviewed [L.V.]." The trial court sustained the Commonwealth's objection, finding that "[w]hat this young woman has been taught to do with respect to investigations," was irrelevant. However, the trial court prompted Via's counsel to present any evidence she might have indicating that Flavin "told this victim to lie or something of that nature." Via's counsel noted her exception, then proffered the training seminar manual for the record.

At the close of the Commonwealth's case-in-chief, Via's counsel made a motion to strike and the trial court overruled the motion.

Paula Via testified on behalf of Via. When Via's counsel attempted to ask Paula about L.V.'s disposition and demeanor when she first came to live with the Vias, the Commonwealth again objected on the basis of relevance. The trial court sustained the objection, finding the "history of the family simply isn't [relevant], if you've got a single event or something of that nature that you want to poke us on that's fine."

Later, when Paula began to testify about the "abuse that [L.V.] had been through in her life before she came to live with [them]," the Commonwealth requested that Paula's remarks be stricken from the record. The trial court admonished the jury to disregard Paula's remarks in this regard, and after asking the jury to retire to the jury room, reminded Via's counsel of his earlier ruling concerning L.V.'s past abuse.

After the jury returned, Paula Via testified about several statements made by L.V. At that time, the Commonwealth objected, arguing that the testimony being elicited was hearsay. The trial court stated, "I wondered when you were going to ask," then sustained the objection.

Via testified on his own behalf and denied having "sex with [his] daughter" or "oral sex with [his] daughter." Via testified that L.V. was the one who had solicited him for sex. The remainder of Via's case-in-chief consisted, in large part, of testimony from several witnesses, offered for the purpose of establishing that L.V. had not complained to others of abuse and/or to serve as character witnesses for Via. One witness, Rochelle Glover, testified that she was a family friend. However, she also stated that she was a registered nurse, specializing in pediatric emergency medicine. After Glover testified that she "did" most of the pediatric sexual assault cases when she worked in the "emergency department," the trial court stated that "[s]he better not" "offer any kind of opinion." Glover went on to testify that, although she spent time with L.V. "many times," L.V. never reported the abuse to her.

Before resting his defense, Via's counsel proffered evidence for the record that the trial court had earlier ruled inadmissible. Via's counsel stated that there were two groups of evidence to proffer. The first group consisted of evidence concerning L.V.'s relationship with Isaiah, which would be as follows: 1) A friend of L.V.'s would testify that during the summer of 2001, L.V. told her she "couldn't believe [her] Dad" would not let her "go out with Isaiah until [she was] older"; 2) L.V.'s maternal grandmother would testify that L.V. spoke with her that summer, on more than one occasion, about "seeing" Isaiah before July 2001; 3) Via's brother would testify that he had, on several occasions that summer, seen a silver pickup truck, similar to that driven by Isaiah's brother, parked near the Via home, as well as the horse farm where L.V. rode horses; and 4) L.V.'s paternal grandfather would testify that he had found the outside light near the entrance to the Via basement (where L.V.'s bedroom was located) disabled.

Via's counsel proffered that the second category of evidence concerned L.V's prior sexual abuse which occurred in Montgomery County. Relevant to this appeal, Via's counsel proffered testimony from a foster parent L.V. had lived with in Montgomery County, before she lived with the Vias. Via's counsel stated that the foster parent would testify that L.V. told her, in 1993, that she did not want to go home because her birth mother's boyfriend had sexually abused her. Via's counsel proffered that a Montgomery County social worker would testify that this report came just after L.V. was informed she would be returned to her mother's home. Further, when L.V. was told she might then be returned to her birth father's home, she reported that he had done "the same things to her" and "went beyond," claiming that her birth father "had taken his clothes off, laid on top of her and fondled her."

Following the proffer, the trial court confirmed its earlier rulings, finding the evidence, "to the extent it allege[d] the child had sexual activity to – violate the Rape Shield Statute with

respect to the sodomy charge . . . . And, more importantly, this Romeo and Juliet theory never got anywhere. It never got off the ground."

At the close of the evidence, the trial court prompted Via's counsel to renew her motion to strike, which she did. The trial court then denied the motion. The jury subsequently found Via guilty of both charges and recommended that he be sentenced to serve five years in prison on each charge.

Thereafter, Via's counsel filed a motion to set aside the verdict arguing, in relevant part, that the trial court erred in refusing to quash the Commonwealth's subpoena *duces tecum*, requesting records from Dr. Conley, and in refusing to admit the evidence proffered by the defense. The trial court denied the motion and sentenced Via in accordance with the jury's recommendation.

## II. Analysis

Via asserts several Questions Presented on appeal. We find no merit in any of Via's contentions and for the following reasons, we affirm the judgment of the trial court.

## A.

Via first argues that the trial court erred "by prompting and soliciting evidentiary objections from the Commonwealth in front of the jury and by berating and belittling defense counsel in her efforts to present proper defense evidence."

Via accurately points out that, in Virginia,

> [w]e have repeatedly held that in the trial of a criminal case it is of great importance that the court leave to the jury, exclusively, the consideration of the facts. [Indeed,] [i]n Parsons v. Commonwealth, 154 Va. 832, 152 S.E. 547 [(1930)], it was said: "Trial judges in Virginia do not sit merely to keep order. They must do whatever seems to be necessary to mete out evenhanded justice both to the Commonwealth and to the accused, and they should with care abstain from conduct which tends to indicate to

- 12 -

the jury any opinion upon those facts, which it is their, and not his, duty to pass upon."

Johnson v. Commonwealth, 193 Va. 502, 505, 69 S.E.2d 340, 341 (1952). However, the Supreme Court of Virginia has explained that

[p]atience is a virtue that well adorns a judge, adds to his respect from bar and public, and aids in creating an atmosphere becoming to a forum where [people] bring their disputes for judicial determination. But, as we said in [Parsons], while impatience is regrettable, judges continue to be [human] and do not cast aside all human imperfections when they ascend the bench. To warrant reversal, their error must be more than mere impatience; it must be of such character as to result in prejudice and prevent a fair trial. It would be that kind, of course, if it caused the jury to become prejudiced against the accused, or influenced them in weighing the evidence.

Moore v. Commonwealth, 186 Va. 453, 463, 42 S.E.2d 871, 876 (1947).

Via specifically complains about the trial court's statements "this is so much overkill, it's pathetic," and "it's cumulative to the point of *ad nauseum*." Nevertheless, contrary to Via's contention otherwise, these statements were not made in front of the jury. Thus, they could not have improperly "prejudiced" or "influenced" the jury. Id.

Via next points to two occasions where he contends that the trial court solicited the Commonwealth's objections to evidence. In particular, the family photographs and the love letters between Isaiah and L.V. Via also points to the trial court's statement, concerning a defense witness who was a "registered nurse specializing in pediatric emergency medicine," that "[s]he better not offer an opinion."[3]

After a careful review of the record, however, we do not find such instances constitute an expression of the trial court's opinion of the evidence, nor do we find from this record that the trial court's actions improperly prejudiced or influenced the jury. When considered in the

---

[3] As stated above, this witness did not testify as an expert witness.

- 13 -

appropriate context, it is clear that the trial court's statements or "solicited" objections did not bear on the validity of the evidence being offered in any manner. Moreover, the trial court's statement concerning the opinion evidence appeared to be merely the court's attempt to remind counsel of his earlier rulings in this regard and/or recognition that Via's counsel had failed to lay a proper foundation for expert testimony from that particular witness.

Virginia courts have consistently held that "[t]he conduct of a trial is committed to the sound discretion of the trial court." Justus v. Commonwealth, 222 Va. 667, 676, 283 S.E.2d 905, 910 (1981), cert. denied, 455 U.S. 983 (1982); Cunningham v. Commonwealth, 2 Va. App. 358, 365, 344 S.E.2d 389, 393 (1986). Indeed,

> [c]ases should not be reversed merely because the judge was impatient, or because he of his own motion ruled out improper testimony and objected to unnecessary repetition; even tilts with counsel are not sufficient. No trial is perfect, and error will at times creep in, particularly in hotly contested cases. To warrant a reversal [the error] must be substantial; otherwise litigation would be interminable.

Parsons, 154 Va. at 852-53, 152 S.E. at 554.

We find no such substantial prejudice here, nor has Via alleged any specific prejudice. Instead, Via states that the "collective impact" of the trial court's conduct "cannot be ignored." However, when we review the record as a whole and consider the trial court's statements in their proper context, it is clear that the trial court, while obviously impatient and abrupt on occasions, was equally so with both parties. Moreover, the trial court specifically instructed the jury, *at the beginning of the trial*, that his comments and demeanor should not be interpreted as indicative of his opinion. While we do not condone certain comments and the occasional lapse in the judicial demeanor of the trial court, we find no evidence of substantial bias on the part of the judge. Accordingly, we decline to reverse on this ground. See Cunningham, 2 Va. App. at 365, 344 S.E.2d at 393 ("This court has no duty to deduce bias from the record.").

- 14 -

B.

Via next argues the trial court erred in refusing to admit evidence that L.V. had engaged in a much more involved relationship with Isaiah than she claimed in her testimony. Specifically, for purposes of impeachment, Via contends the trial court should have admitted L.V.'s diaries, the love letters between L.V. and Isaiah, the testimony proffered that L.V. had been "seeing" Isaiah before July of 2001, that his car had been seen near the home and horse farm, that the basement entrance light had been disabled, and that L.V. was concerned Via would not let her "go out with" Isaiah, as well as the testimony proffered concerning L.V.'s prior reports of abuse.

Via also argues the trial court erred in refusing to admit evidence of L.V.'s behavior and statements after August 18, 2001, in refusing to admit testimony concerning L.V.'s demeanor and emotional state when she first came to live with the Vias, and refusing to allow him to cross-examine Flavin "as to her method of interviewing complainant and how it was contrary to her training and could have tainted the interview by coaching and supplying details."

It is, of course, fundamental that the Commonwealth had the burden of proving each element of its case, Martin v. Commonwealth, 13 Va. App. 524, 529, 414 S.E.2d 401, 403 (1992) (*en banc*), and Via had the "right to call for evidence" in his favor, see Va. Const. art I, § 8A. However, it is well settled that "[t]he admissibility of evidence is within the broad discretion of the trial court, and a ruling will not be disturbed on appeal in the absence of an abuse of discretion." James v. Commonwealth, 18 Va. App. 746, 753, 446 S.E.2d 900, 904 (1994). Generally speaking, "[e]vidence is admissible if it is both relevant and material," and it is inadmissible if it fails to satisfy these criteria. Evans-Smith v. Commonwealth, 5 Va. App. 188, 196, 198, 361 S.E.2d 436, 441, 442 (1987). "Evidence is relevant if it has any logical tendency, however slight, to establish a fact at issue in the case." Ragland v. Commonwealth, 16 Va. App.

- 15 -

913, 918, 434 S.E.2d 675, 678 (1993). "Evidence is material if it relates to a matter properly at issue." Evans-Smith, 5 Va. App. at 196, 361 S.E.2d at 441.

> When a witness takes the stand, she puts her credibility at issue in the case. See Smith v. Commonwealth, 212 Va. 675, 676, 187 S.E.2d 191, 192 (1972). Thus, the opposing party may impeach the witness by "draw[ing] into question the accuracy of the witness's perception, recordation, recollection, narration, or sincerity." Strong, 1 McCormick on Evidence, § 33 n.5, at 123 (5th ed. 1999) (citations omitted). "Any evidence which would tend to convince the jury that the witness's perception, memory, or narration is defective or that his or her veracity is questionable is relevant for purposes of impeachment." Friend, Law of Evidence in Virginia, § 4-1, at 101 (5th ed. 1993).

McCarter v. Commonwealth, 38 Va. App. 502, 506, 566 S.E.2d 868, 869-70 (2002) (other citations omitted). Considering these rules, we find no error in the trial court's determination to exclude the evidence recited above.

First, with regard to L.V.'s diaries, as the trial court noted, L.V. conceded that she had only written about the abuse on one occasion. Accordingly, any evidence concerning a lack of writings in the diaries would have been cumulative and clearly irrelevant.

With regard to the love letters, we note that Via's defense theory was that L.V. fabricated the charges against Via in order to get him removed from the home, so that he could not interfere with her relationship with Isaiah. However, as noted by the trial court, the letters were composed after L.V. lodged the complaint. Furthermore, Via's basis for introducing the letters was his contention that the letters proved L.V. feared Via would not allow her to see Isaiah and "totally contradicted" L.V.'s testimony that "she went out with [Isaiah] three times but was never unchaperoned."

Even assuming Via's contentions are true, L.V. conceded in her testimony that she was afraid Via would not approve of her relationship with Isaiah. Furthermore, although Via's counsel proffered the love letters for the record, she never identified or proffered any statements

- 16 -

in the letters which contradicted L.V.'s testimony, nor did she bring the letters to L.V.'s attention or lay any foundation for introduction of the letters as prior inconsistent statements. See Friend, Law of Evidence in Virginia, § 4-5(a), at 119 (5th ed. 1999) ("[T]he prior inconsistent statements must in fact be inconsistent with or contradictory to the present testimony and must have emanated from the witness himself."); McCarter, 38 Va. App. at 506, 566 S.E.2d at 869-70; see also Adams v. Ristine, 138 Va. 273, 293, 122 S.E. 126, 132 (1924) ("It is well settled that if it is intended to impeach a witness by a prior inconsistent statement, the foundation should be laid by first calling the attention of the witness to the alleged inconsistent statement and enquiring whether he made it."); Fisher v. Commonwealth, 26 Va. App. 788, 794, 497 S.E.2d 162, 165 (1998) ("When defendant's counsel failed to cross-examine [the witness] relative to the alleged inconsistent statements . . . he failed to lay a proper foundation necessary to impeach [the witness] through testimony regarding such statements.").[4] Accordingly, we find no abuse of discretion on the part of the trial court in refusing to admit this evidence.

Turning to the statements pertaining to L.V.'s concern that Via would not let her date Isaiah until she was older, her statements that she had "seen" Isaiah prior to July of 2001, as well as the statements concerning the observation of a silver pickup truck and the disabled light, we find that this proffered testimony was irrelevant, cumulative and/or collateral to any issue in the case and, therefore, properly excluded. Indeed, L.V. conceded that she was afraid Via would not

---

[4] We note that although Via raised the admissibility of these letters (based upon their content) as a specific claim of error on appeal, he failed to include the proffered letters as a part of the joint appendix or record on appeal. We remind Via's counsel that it is the appellant's responsibility on appeal to provide this Court with an appropriate appendix and record. See Rule 5A:20; see also Justis v. Young, 202 Va. 631, 632, 119 S.E.2d 255, 256 (1961) ("We have many times pointed out that on appeal the judgment of the lower court is presumed to be correct and the burden is on the appellant to present to us a sufficient record from which we can determine whether the lower court has erred in the respect complained of. If the appellant fails to do this, the judgment will be affirmed.").

approve of her relationship with Isaiah. L.V. also conceded that she "saw" Isaiah on three occasions. She did not testify to the dates of those occasions.

Further, the evidence concerning the silver pickup truck and the disabled light was, at best, collateral to the issues in this case.

> A fact is wholly collateral to the main issue if the fact cannot be used in evidence for any purpose other than for contradiction. Evidence of collateral facts, from which no fair inferences can be drawn tending to throw light upon the particular fact under investigation, is properly excluded for the reason that such evidence tends to draw the minds of the jury away from the point in issue, to excite prejudice and mislead them.

Helmick v. Commonwealth, 38 Va. App. 558, 564-65, 567 S.E.2d 551, 554-55 (2002); see also PTS Corp. v. Buckman, 263 Va. 613, 621, 561 S.E.2d 718, 722 (2002) ("The determination that proffered evidence is collateral, is, in essence, a determination of relevance."); see also Coe v. Commonwealth, 231 Va. 83, 87, 340 S.E.2d 820, 823 (1986). Moreover, none of this particular testimony directly contradicted L.V.'s testimony or version of the relevant events. Thus, we find no error in the trial court's determination that this evidence was irrelevant and immaterial and therefore, inadmissible.

We likewise find no merit in Via's contention that the trial court improperly refused to admit evidence of L.V.'s "behavior, statements and events after August 18, 2001," as well as her demeanor and emotional state when she first came to live with the Vias, nearly six years prior to the trial. As stated above, it is most certainly within the discretion of the trial court to exclude evidence which is not relevant or material to any matter properly at issue in the case. Helmick, 38 Va. App. at 564-65, 567 S.E.2d at 554-55; Evans-Smith, 5 Va. App. at 196, 361 S.E.2d at 441. We find no reason to hold that such evidence was relevant in terms of the disputed issues in the case, nor in terms of L.V.'s credibility as a witness.

- 18 -

Finally, we find no error in the trial court's decision to preclude testimony concerning Flavin's interview techniques as they related to the seminar training manual produced by Via. Via proffered no evidence, nor even a mere allegation, that Flavin engaged in any improper conduct when questioning L.V. Accordingly, the trial court's determination that the manual was irrelevant was not tantamount to an abuse of discretion. We thus affirm Via's convictions on these grounds.

C.

Via next contends the trial court erred in refusing to admit evidence concerning L.V.'s prior reports of sexual abuse, by "incorrectly applying the 'Rape Shield Statute.'"

Code § 18.2-67.7, referred to as the "rape shield" law, excludes evidence in sexual assault cases,

> of the "general reputation . . . of the complaining witness's unchaste character or prior sexual conduct" . . . [which is] defined as "any sexual conduct on the part of the complaining witness which took place before the conclusion of the trial, excluding the conduct involved in the offense alleged under this article."

Clinebell v. Commonwealth, 235 Va. 319, 322, 368 S.E.2d 263, 264 (1988).

Here, on the basis of the rape shield law, the trial court specifically refused to allow evidence "to the extent it alleges the child had sexual activity" and only with respect to the sodomy charge. Indeed, in its written order, the trial court specifically stated

> 2) The Rape Shield Statute (Sect. 18.20-67.7) [sic] does not apply to the charge of incest, but does apply to the charge of forcible sodomy; and

> 3) Evidence about the *sexual activities* of [L.V.] which occurred in Montgomery County, Virginia before she was adopted, are not admissible.

(Emphasis added).

- 19 -

Via contends that the trial court erred in applying the rape shield law to preclude evidence concerning L.V.'s prior reports of abuse. We need not reach the merits of Via's claim in this regard. Via simply misapprehends the trial court's ruling. In fact, the record reflects that the trial court ruled that any "reports" of sexual abuse would not be barred from admission, as long as Via laid the proper foundation. Specifically, the court stated, "the fact that the report – she made a report and what happened thereafter, may be admissible, provided you – you establish a relevance [sic]."

Via attempted to admit no such evidence, nor did Via attempt to lay the proper foundation for such evidence. See Clinebell, 235 Va. at 325, 368 S.E.2d at 266 ("A complaining witness' prior accusations are admissible, however, only if a court makes a threshold determination that a reasonable probability of falsity exists."). Indeed, the record reflects that Via's counsel abandoned any attempt to offer such evidence. Accordingly, we find no abuse of discretion and we affirm the trial court on this ground.

D.

Finally, Via argues the trial court erred in refusing to quash the Commonwealth's subpoena *duces tecum* seeking records in possession of Dr. Conley as they related to statements made by Via, his wife, and L.V.

As stated above, Via asserts that he hired Dr. Conley "[a]s a part of [his] preparation of the defense of these charges" "to assist in evaluating the complainant, suggest defense theories and method of presentations of those theories at trial." Thus, Via contends Dr. Conley's records were protected by the attorney/client privilege and constituted attorney work product. Via further contends that the Commonwealth's request for the documents equated to an "effort to circumvent Rule 3A:11."

- 20 -

There can be no doubt that

> [c]onfidential communications between attorney and client made
> because of that relationship and concerning the subject matter of
> the attorney's employment "are privileged from disclosure, even
> for the purpose of administering justice." Grant v. Harris, 116 Va.
> 642, 648, 82 S.E. 718, 719 (1914); accord Seventh District
> Committee v. Gunter, 212 Va. 278, 287, 183 S.E.2d 713, 719
> (1971).

Commonwealth v. Edwards, 235 Va. 499, 508-09, 370 S.E.2d 296, 301 (1988). "The privilege

attaches to communications of the client made to the attorney's agents . . . when such agent's

services are indispensable to the attorney's effective representation of the client." Id.

"Nevertheless, the privilege is an exception to the general duty to disclose, is an obstacle to

investigation of the truth, and should be strictly construed." Id. And "[t]he party seeking to

assert the attorney-client privilege bears the burden of persuasion on the issue." Id. at 509, 370

S.E.2d at 301.

In this case, Via proffered no evidence for the record in any effort to establish the

"indispensability" of Dr. Conley's services. Thus, there was simply no reason for the trial court

to have declared Dr. Conley an "agent" of Via's counsel.

As we have found no evidence in the record to support Via's theory that Dr. Conley was

an "agent" of his counsel, we find no reason to reverse the trial court's ruling that Dr. Conley's

records did not qualify as his attorney's "work product."

Finally, there is no issue here of the proper application of Rule 3A:11. Rule 3A:11

provides that when *a defendant* seeks certain discovery from *the Commonwealth*, a trial court

may condition such discovery upon the Commonwealth receiving certain specified reciprocal

discovery from the defendant. See Rule 3A:11. The discovery made available to the

Commonwealth is limited to "written reports of autopsy examinations, ballistic tests, fingerprint,

- 21 -

blood, urine and breath analyses, and other scientific tests that may be within the accused's possession . . . ." Id.

The subpoena here, however, did not seek production of documents in Via's possession, but documents in the possession of Dr. Conley – a third party. Because we have found that the record belies Via's assertion that Dr. Conley was an agent of his counsel for purposes of the litigation at issue, we find no error in the trial court's refusal to quash the Commonwealth's subpoena *duces tecum* pursuant to Rule 3A:11.[5] Indeed, "[i]n a criminal proceeding, either the defendant or the Commonwealth may apply for a subpoena to obtain writings and objects that are material to the proceedings and in the possession of a third party." Gibbs v. Commonwealth, 16 Va. App. 697, 699, 437 S.E.2d 514, 515 (1993). "The scope of a subpoena *duces tecum* is not limited to those objects or documents that may be used at trial." Id. Rather, such a subpoena may be obtained where there is a "'substantial basis for claiming' that the documents or objects sought were material." Id.

For the above-stated reasons, we affirm Via's convictions.

Affirmed.

---

[5] Cf. Ramirez v. Commonwealth, 20 Va. App. 292, 296-97, 456 S.E.2d 531, 533 (1995) (finding employees of DSS involved in the investigation of the child abuse allegation were agents of the Commonwealth for purposes of Rule 3A:11(b)(2), noting that "where an agency is involved in the investigation or prosecution of a particular criminal case, agency employees become agents of the Commonwealth for purposes of Rule 3A:11 and must be considered a party to the action for purposes of Rule 3A:12").