COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present: Judges Malveaux, Athey and Callins
Argued at Lexington, Virginia


JOSEPH LEE LOFTIS

                                              MEMORANDUM OPINION[*] BY
v.        Record No. 0105-22-3              JUDGE DOMINIQUE A. CALLINS
                                                   MAY 2, 2023

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF DANVILLE
Joseph W. Milam, Jr., Judge

Jason S. Eisner for appellant.

Mason D. Williams, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


A jury convicted Joseph Lee Loftis of armed statutory burglary with the intent to commit

assault and battery, use of a firearm in the commission of a felony, brandishing a firearm, and

misdemeanor vandalism. Additionally, the trial court convicted Loftis of possessing a firearm after

conviction of a violent felony. The trial court imposed a lengthy combined prison sentence but

suspended a substantial portion.[1] The trial court also found that Loftis violated the terms of his

supervised probation, and revoked his previously suspended thirty-year sentence, resuspending

twenty-seven years. Loftis contends that the trial court erred by denying his motion for a mistrial,

by barring the use of certain impeachment evidence, and by finding that the evidence was sufficient

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413.

[1] The final sentencing order states that the jury convicted Loftis of assault and battery but does not impose a sentence for that offense. Given that the jury acquitted Loftis of this offense, we find that the mistake in listing a conviction for assault and battery was a clerical error, and we remand to the trial court for the limited purpose of correcting the final sentencing order. *See* Code § 8.01-428(B) (governing correction of clerical errors by the trial court).

to find him guilty of three of the four felony charges. As a result, Loftis further contends that, upon reversing the aforementioned convictions, we must also reverse the revocation of his probation violation. Finding no error, we affirm the judgment of the trial court, and remand for the limited purpose of correcting a clerical error in the final sentencing order.

I. The evidence was sufficient to sustain Loftis's convictions for possessing a firearm after having been convicted of a violent felony, statutory burglary with the intent to commit assault and battery, use of a firearm in the commission of a felony, and brandishing a firearm.

a. *Background*

Crystal Hendley rented Room 117 at the Budget Inn on Piney Forest Road in Danville. After receiving a text from Heather Davis—Hendley's friend and Loftis's girlfriend—Hendley drove to Loftis's home in Danville to pick up Davis. When Hendley knocked on the door, Loftis answered and told her that Davis was not there, even though Hendley could hear Davis inside the home. Loftis then "pulled out a gun and told [Hendley] to get off of his property" or "he was going to kill" her. Loftis held the gun to Hendley's head, and she felt that it was metal. She knew the weapon Loftis held to her head was a gun because she "knew the difference between a plastic gun and a toy gun and a real gun[.]" She also stated that she had been friends with Loftis and confirmed that she had seen the firearm previously.

After Loftis held the firearm to Hendley's head and threatened to kill her, she demanded that he let Davis "go." Loftis complied after "a second," and Davis ran to Hendley's vehicle. At trial, the Commonwealth played a portion of surveillance video recorded by cameras at Loftis's home. Hendley stated that the video showed "the front side" of Loftis's home and identified the points in the video when she arrived at Loftis's home, when Loftis held the firearm to her head, and when she and Davis ran to her vehicle.

After Hendley and Davis left Loftis's home, Hendley dropped off Davis "somewhere safe" and then returned to her room at the Budget Inn. At approximately 3:00 a.m. on November

7, Loftis arrived at Hendley's motel. Hendley heard a "loud noise" and saw that Loftis had "shattered" the motel room window. Loftis climbed up on the window frame and asked Hendley where Davis was; Hendley told him that Davis was not there. Loftis then climbed through the window into the room to search for Davis. When Loftis saw that Davis was not in the room, he struck Hendley's head with the same firearm he had used earlier to threaten her, leaving several "knots" and bumps. The Commonwealth played video captured by the motel's security camera, which showed Loftis exit his vehicle, approach Hendley's room, and immediately smash the window using an object resembling a firearm in his right hand. The video shows Loftis stood on the window frame for approximately fifteen seconds before climbing through the window into the room. Loftis stayed in the motel room—out of view of the security camera—for approximately fifteen seconds before exiting, returning to his vehicle, and leaving.

Once Loftis left the motel, Hendley drove to pick up Davis and they went to the police station together. They spoke to Danville Police Officer Touchstone in the parking lot. Officer Touchstone did not see any injuries to Hendley but felt the knots on her head. Loftis had called Davis's cell phone as he broke into the motel room, so audio of the incident was recorded on Davis's voicemail. Hendley and Davis played the voicemail for Officer Touchstone, whose body camera recorded his interaction with Hendley and Davis; the Commonwealth played the portion of the body camera video showing the playback of the voicemail message.

After Officer Touchstone spoke with Hendley and Davis, he obtained a warrant to search Loftis's home. Officer Touchstone and Hendley, who was present when Touchstone executed the search warrant, observed a bullet casing on the driver's seat of a vehicle parked in a carport to the left of the front of Loftis's home. Hendley stated that the vehicle belonged to Davis. Officer Touchstone testified that "the entire back yard" and the "very back porch" of Loftis's

- 3 -

home was "over the state line" in North Carolina. The remainder of the property, including "the front yard where you come in" and "drive up," was "within the city limits of Danville."

After the conclusion of the evidence, Loftis moved to strike, arguing, among other things, that, concerning Hendley's testimony, "we heard there have been some issues with her evolving story and perception of what happened based on what seems like some pretty generous substance use." The trial court denied the motion. In closing, Loftis, again, questioned Hendley's credibility, claiming, "she said certain things at the preliminary hearing[,] Commonwealth argues[,] and of course she says on the witness stand[,] well no[,] she lied at the preliminary hearing[,] she lied admittedly under oath," and, "[w]e also know that she had a pretty extensive history of drug use."

The jury acquitted Loftis of assault and battery and convicted him of statutory burglary, vandalism, and brandishing. Separately, the trial court convicted him of possessing a firearm after conviction of a violent felony, and sentenced Loftis to eight years' active incarceration, the combined mandatory minimum for the use of a firearm in committing a felony (first offense) and possession of a firearm by a convicted violent felon.

b. *Analysis*

Loftis challenges the sufficiency of the evidence to support his convictions of being a violent felon in possession of a firearm, statutory burglary with intent to commit assault and battery, and of brandishing a firearm.

"When the sufficiency of the evidence to support a conviction is challenged, it is [the appellate court's] duty to view the evidence in the light most favorable to the Commonwealth and to uphold the conviction unless it is plainly wrong or without evidence to support it." *Ramos v. Commonwealth*, 71 Va. App. 150, 161 (2019) (alteration in original) (quoting *Case v. Commonwealth*, 63 Va. App. 14, 22 (2014)). "'If there is evidentiary support for the conviction,

- 4 -

"the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial."'" *Eberhardt v. Commonwealth*, 74 Va. App. 23, 31 (2021) (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)). Embedded within this principle is the understanding that "deference is owed to both the trial court's assessment of the credibility of the witnesses and the inferences to be drawn 'from basic facts to ultimate facts.'" *Id.* (quoting *Davis v. Commonwealth*, 65 Va. App. 485, 500 (2015)). "In the end, the appellate court 'ask[s] whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."'" *Id.* (alteration in original) (quoting *Crowder v. Commonwealth*, 41 Va. App. 658, 663 (2003)).

### i. Felon-in-Possession

Loftis contends that the Commonwealth failed to prove that the object he possessed was a firearm as defined under Code § 18.2-308.2. He argues that Hendley's description of the object's physical characteristics was "insufficient to satisfy the stringent requirements of [the] statute." Loftis insists that "[t]he trial court could not find that the burden was met based on someone calling [the object] a gun" and as the Commonwealth did not produce the item nor any evidence that it was a firearm, it failed to meet its burden.

This Court has held that Code § 18.2-308.2(A) "requires the Commonwealth to prove, as an essential element of the offense, that the accused possessed an actual firearm, not merely an object of similar appearance." *Redd v. Commonwealth*, 29 Va. App. 256, 258 (1999). And it is well-established that an "actual firearm" is an "'instrument which was designed, made, and intended to expel a projectile by means of an explosion,'" though it need not be "'operable [or] capable of being fired.'" *Startin v. Commonwealth*, 281 Va. 374, 381 (2011) (alteration in original) (quoting *Armstrong v. Commonwealth*, 263 Va. 573, 583-84 (2002)). It is insufficient to satisfy the statute that the object in question *appears* to be a firearm.

- 5 -

Our Supreme Court has held that an object can be proved a firearm by circumstantial evidence. In *Jordan v. Commonwealth*, 286 Va. 153, 155 (2013), a victim testified that the appellant pointed "a gun" at his head and demanded that the victim get out of his truck. The victim also identified the make of the gun used in the confrontation. *Id.* In rejecting the appellant's argument that the Commonwealth failed to prove that "[he] possessed an actual firearm and not an instrument of similar appearance," *id.* at 156, the Supreme Court emphasized the victim's ability to identify the specific gun and the appellant's clear "message that if [the victim] did not comply, [the appellant] would *shoot* him," *id.* at 158 (emphasis added). "It was within the province of the jury," the Supreme Court held, "to conclude that [the appellant's] conduct was an implied assertion that the object he held was a firearm." *Id.* at 159. Similarly, in *Redd*, we held that, although the victim's description of the "object brandished by [the appellant]" was alone "insufficient" to prove use of a firearm, the appellant's "threat, upon presenting the weapon, to kill the [victim] was an implied assertion that the object was a functioning weapon, being in fact the firearm that it appeared to be and possessing the power to kill," was "evidence sufficient to support the trial court's finding that the object was a firearm." 29 Va. App. at 259.

Accordingly, we have held that "the law in Virginia, as stated in *Redd* and supported in *Jordan*, is that the specific 'designed, made, and intended to fire or expel a projectile by means of an explosion' language is not required [to sustain a conviction under Code § 18.2-308.2]." *Speller v. Commonwealth*, 69 Va. App. 378, 394-95 (2018). "To be sure, the Commonwealth must present sufficient evidence to support a finding that the object was designed, made, and intended to fire or expel a projectile by means of an explosion." *Id.* at 395. Yet, this Court has "declined[d] to require the Commonwealth to present *specific testimony* that the object was designed, made, and intended to fire or expel a projectile by means of an explosion." *Id.*

Instead, whether a firearm meets the requisite definition "is a question of fact that may be proven by circumstantial evidence." *Id.*

Loftis asserts that the only evidence that the instrument he possessed was a firearm was the bullet casing that Officer Touchstone found in Davis's car while it was parked at Loftis's home. To the contrary, Hendley testified that when she arrived at Loftis's home, he held the object to her head and threatened to kill her unless she left his property. Additionally, Hendley testified that she was familiar with the object. In particular, Hendley testified that it was a "real gun" and stated both that she had seen it before because she had been friends with Loftis and that she knew the difference between a "toy gun" and a "real gun." Hendley's "ability to identify [Loftis's] pistol was subject to cross-examination," and "[t]he determination of how much weight to give to [her] identification of the object as [Loftis's] pistol was a matter for the trier of fact." *Jordan*, 286 Va. at 158.

Taken together, Loftis's implied assertion that the weapon was a gun and Hendley's description of Loftis's weapon were sufficient to prove that the instrument he possessed was a firearm. *See id.* at 157-58. Thus, it was not unreasonable for a finder of fact to have found, beyond a reasonable doubt, that the Commonwealth met its burden in proving that Loftis, a convicted felon, possessed a firearm and satisfied the elements of Code § 18.2-308.2(A).

### ii. Statutory Burglary with Intent to Commit Assault and Battery

Loftis also asserts that the evidence was insufficient to support his conviction for statutory burglary because the Commonwealth failed to prove that he entered Hendley's motel room with the intent to commit assault and battery. An individual may be guilty of statutory burglary if that "person in the nighttime enters . . . a dwelling house" with "intent to commit assault and battery" and "was armed with a deadly weapon." Code §§ 18.2-90, 18.2-91. As Loftis correctly notes, "the Commonwealth was required to prove that *at the time* [he] entered [the motel room], he intended to commit an assault and battery." *Jones v. Commonwealth*, 279 Va. 295, 299 (2010).

"When a statute, such as Code § 18.2-91, 'makes an offense consist of an act combined with a particular *intent*, such *intent* is as necessary to be proved as the act itself, and it is necessary for the intent to be established as a matter of fact before a conviction can be had." *Vincent v. Commonwealth*, 276 Va. 648, 652 (2008) (quoting *Dixon v. Commonwealth*, 197 Va. 380, 382 (1955)). "Intent in fact is the purpose formed in a person's mind and may be, and frequently is, shown by circumstances. It is a state of mind which may be shown by a person's conduct or by his statements." *Id.* (quoting *Hargrave v. Commonwealth*, 214 Va. 436, 437 (1974)). Moreover, "[e]vidence of a person's intent can be proven by the person's conduct and statements '*after* the events that constitute the charged crime.'" *Choon Poong Lee v. Commonwealth*, 68 Va. App. 313, 319 (2017) (quoting *Simon v. Commonwealth*, 58 Va. App. 194, 206 (2011)).

"Circumstantial evidence is not viewed in isolation. While no single piece of evidence may be sufficient, the combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable mind irresistibly to a conclusion." *Finney v. Commonwealth*, 277 Va. 83, 89 (2009) (quoting *Muhammad v. Commonwealth*, 269 Va. 451, 479 (2005)). And although our Supreme Court has "held that 'circumstantial evidence is competent and is entitled to as much weight as direct evidence . . . the circumstantial evidence [must be] sufficiently convincing to exclude every reasonable hypothesis except that of guilt.'" *Id.* (quoting *Dowden v. Commonwealth*, 260 Va. 459, 468 (2000)). However, "[t]he hypotheses which the prosecution must reasonably exclude are those 'which flow from the evidence itself, and not from the imagination of defendant's counsel.'" *Black v. Commonwealth*, 222 Va. 838, 841 (1981) (quoting *Turner v. Commonwealth*, 218 Va. 141, 148 (1977)).

Loftis contends that the evidence does not establish that he intended to commit assault and battery when he broke the window and climbed into Hendley's hotel room because he did not "immediately" commit an assault or battery. Rather, "he asked whether Ms. Davis was in the

- 8 -

room," and "only after discovering that Ms. Davis was not present did he demonstrate any intention to commit the substantive offense." We reject this contention.

Comparing the facts here with those presented in *Breeden v. Commonwealth*, 43 Va. App. 169 (2004), we reveal the defect in Loftis's argument. In *Breeden*, the appellant entered through a window into the home of a former girlfriend. *Id.* at 175. Once inside, he waited. When the former girlfriend arrived home, the appellant "'jumped out from behind the door' with a pistol in his hand." *Id.* He then interrogated her, and "[h]olding the gun, [he] demanded that she tell him where she had been that night." *Id.* After she responded, "'What do you mean, where have I been? What are you doing?,'" the appellant grabbed the former girlfriend's face and, following some ominous rantings and threats, hit her in the nose with his hand. *Id.* Were this Court to have applied Loftis's logic to these facts, we might have found that, despite having entered the home with a deadly weapon, the *Breeden* appellant did not form the *specific* intent to grab his former girlfriend's face and hit her until she questioned him, thereby omitting several other facts critical to the enterprise of determining the appellant's intent at the moment of entry. Instead, we held that because the appellant entered the locked home with a pistol, confronted the former girlfriend, interrogated her, threatened her, and then grabbed her face and hit her, it was reasonable for the "fact finder, [to] . . . infer . . . that [the appellant] had the intent to assault and batter the complaining witness when he broke into and entered her house that night." *Id.* at 182. Put differently, the fact finder was entitled to infer the appellant's intent from the totality of the surrounding circumstances of the conduct in question.

Here, we likewise decline to confine the fact finder to such a cramped and myopic construction of the facts, which must be considered in their totality to ascertain Loftis's intent. The evidence showed that Loftis held a firearm to Hendley's head and threatened to kill her when she came to his home to pick up Davis. He later arrived at Hendley's motel room with an object

resembling a gun in hand, which he violently and without hesitation used to punch through her motel-room window. He then entered the room and demanded to know where Davis was. The audio recording played for the jury, capturing the moments that followed, featured Hendley's screams. That Loftis was "looking for" Davis when he entered the room does not preclude a rational fact finder from determining that he intended to commit an assault and battery when he entered. *See Walker v. Commonwealth*, 74 Va. App. 475, 494 (2022) ("[A] perpetrator may possess multiple intents at the same time.").

What is more, that Loftis entered the motel room with *gun in hand* should not be allowed to dissolve into the background. We have held that use of a deadly weapon, by itself, *may* support an inference of "an intent to maim, disfigure or kill." *Witherow v. Commonwealth*, 65 Va. App. 557, 571 (2015) (quoting *Williams v. Commonwealth*, 13 Va. App. 393, 398 (1991)). This case does not involve malicious wounding. Nevertheless, the common-sense proposition that a deadly weapon, like a firearm, is a technology of harm, stands. Loftis's apparent open and violent use of such an instrument to enter *Hendley's* motel room, *when coupled* with his earlier threats against Hendley's life and the audio recording, capturing Hendley's screams, irresistibly leads a mind to a conclusion of guilt and leaves no room open for reasonable hypotheses of innocence. It is true that, after entering the motel room, Loftis queried the whereabouts of Davis. However, the fact that he paused to ask questions should not be allowed to eclipse all of those other facts which, together, evince an assaultive intent.

Moreover, it was unnecessary for the Commonwealth to prove that Loftis entered the motel room with the specific intent to assault and batter Hendley, rather than Davis. Instead, it was sufficient for the Commonwealth to prove that Loftis entered the motel room with assaultive intent—and the evidence was more than sufficient to prove that Loftis did so.

Accordingly, a reasonable finder of fact could conclude beyond a reasonable doubt that Loftis broke into Hendley's motel room with the intent to commit assault and battery.[2]

### iii. Brandishing

Loftis also challenges the sufficiency of the evidence to sustain his conviction for brandishing a firearm. He contends that it is unclear whether the jury convicted him of this offense based on his conduct at his home or at the motel. He asserts that the Commonwealth failed to prove that the conduct at his home occurred within Virginia because "portions of the residence, including the actual building, were not in Virginia." Further, Loftis contends that Hendley's testimony that he brandished the firearm at the motel was inherently incredible.

Loftis is correct that "[e]very crime to be punished in Virginia must be committed in Virginia." *Jones v. Commonwealth*, 42 Va. App. 142, 146 (2004). We conclude, however, that the Commonwealth sufficiently proved that Loftis brandished a firearm in Danville. Officer Touchstone, while noting that some portions of Loftis's home were in North Carolina, testified unequivocally that "the front yard where you come in" and "drive up" was in the city limits. Hendley testified that her interaction with Loftis at his home—recorded by the surveillance camera—occurred on the "front side" of the home. Viewed in the light most favorable to the Commonwealth, the testimony of Hendley and Officer Touchstone was sufficient to prove that Loftis brandished a firearm in Danville, and thus, in Virginia.

Additionally, Loftis contends that Hendley's testimony was incredible. We hold that a rational fact finder could have convicted Loftis of brandishing a firearm based either on his

---

[2] Loftis also contends that "because the breaking and entering charge was not proven beyond a reasonable doubt, the evidence fails for the use of a firearm charge as well[.]" Because the evidence was sufficient for a fact finder to conclude beyond a reasonable doubt that Loftis broke into Hendley's motel room with the intent to commit assault and battery, Loftis's contention that there was insufficient evidence to support his use of a firearm in the commission of a felony conviction is without merit.

conduct at his home or at the motel. It is true that there were inconsistencies in Hendley's testimony.[3] Indeed, Hendley admitted that she was subject to "pressure" to give false testimony.

But "[t]he fact that a witness makes inconsistent statements in regard to the subject matter under investigation does not render [her] testimony nugatory or unworthy of belief." *Swanson v. Commonwealth*, 8 Va. App. 376, 378 (1989). "It is the province of the trier of the facts—jury or judge—'to pass upon such inconsistent statements and give or withhold their assent to the truthfulness of the particular statement.'" *Id.* (quoting *Shelton v. Mullins*, 207 Va. 17, 22 (1966)). In fact, "[t]estimony may be contradictory or contain inconsistencies without rising to the level of being inherently incredible as a matter of law." *Kelly v. Commonwealth*, 69 Va. App. 617, 626 (2019).

It was within the province of the jury to grant or withhold assent to the truthfulness of Hendley's claims. However, the jury, as fact finder, was not beholden to Hendley's testimony. The jury was presented with video and audio evidence, upon which it could make independent determinations and test the veracity of Hendley's testimony. The jury watched Loftis as he thrust an object resembling a gun through Hendley's motel-room window. They listened to an audio recording that captured the commotion that followed Loftis's entry into the motel room, as well as Hendley's screams. They saw video showing Loftis in his front drive, arm outstretched, with an object pointed at Hendley. Even had the jury found Hendley's testimony unreliable, there was solid, independent evidence sufficient for it to find Loftis brandished a firearm.

---

[3] Hendley's testimony is the subject of section II, *infra*.

- 12 -

## II. The trial court did not abuse its discretion by limiting Loftis's cross-examination of Hendley.

### a. *Background*

On cross-examination, defense counsel impeached Hendley with several portions of her testimony from the preliminary hearing that were inconsistent with her trial testimony. Hendley admitted that what she said at the preliminary hearing "was not exactly the truth," and acknowledged that she had lied. Hendley also admitted that she was "significantly under the influence of" drugs on the night of the incidents, likely including alcohol, methamphetamine, and heroin. She further acknowledged that she "may have" told Davis "a couple months" before the trial that she was "pretty messed up and d[idn't] remember anything."

Hendley confirmed that she was convicted of shoplifting in 2015 and felony possession of a controlled substance in September 2020. Defense counsel then requested to approach the bench; the bench conference was not on the record. Once cross-examination resumed, defense counsel asked Hendley if she was "under the influence of any substances right now"; she answered, "No." When asked "[h]ow long" it had been since she "used," Hendley responded that she had "been clean for at least a month." On redirect, Hendley referred to Loftis as her "codefendant," and stated that she knew Loftis and Davis because she "g[ot] high" with them. She again acknowledged the inconsistencies between her testimony at the preliminary hearing and at the trial, explaining that she was "messed up" and "wasn't clear" at the preliminary hearing. Hendley also indicated that Davis had been "putting pressure" on her relating to Loftis "being in jail."

After the Commonwealth rested, defense counsel stated that during the unrecorded bench conference he had asked the trial court's permission to question Hendey regarding her arrest five days before trial on a capias for failure to appear at an earlier proceeding in this case. Defense counsel asserted that when Hendley was arrested she was found "in possession of five syringes"

- 13 -

and "other material" which had "been sent to the lab" for analysis. Defense counsel sought to question Hendley about the syringes to explore whether "she might have a motive to fabricate," related to any criminal charges she might face. The defense also asserted that Hendley's possession of the syringes was inconsistent with her assertion that she had been "clean" for at least a month before trial.

The prosecutor objected, arguing that the Commonwealth had not brought any charges against Hendley related to the items in her possession at the time of her recent arrest. Thus, any testimony about bias on potential future charges would be speculative. The prosecutor also noted that the jury saw Hendley testify wearing handcuffs and heard her refer to Loftis as her "codefendant."

The trial court, observing that Hendley was "wearing jail clothes," sustained the Commonwealth's objection to Loftis's proposed cross-examination. The court concluded that questioning Hendley about the items she possessed at the time of her recent arrest was too "tenuous" to her credibility to constitute permissible impeachment and that the potential prejudice would outweigh any probative value. Moreover, the trial court agreed that Hendley's possession of the syringes did not necessarily contradict her previous statement that she had been clean for at least a month before trial.

b. *Analysis*

Loftis argues that the trial court abused its discretion by prohibiting defense counsel from cross-examining Hendley on her arrest which occurred several days before trial. He contends that this line of questioning was probative of her potential bias in favor of the Commonwealth.

Loftis also argues that the proposed cross-examination would have impeached the credibility of Hendley's testimony that she had been "clean" for at least a month before trial.[4]

"Two threshold principles govern appellate review of evidentiary decisions." *Thomas v. Commonwealth*, 44 Va. App. 741, 753, *adopted upon rehearing en banc*, 45 Va. App. 811 (2005). "First, we do not review such decisions *de novo*." *Id.* "'Given the "broad discretion" of a trial judge over evidentiary matters, we apply a deferential abuse-of-discretion standard of appellate review.'" *Id.* (quoting *Seaton v. Commonwealth*, 42 Va. App. 739, 752 (2004)). "This standard, if nothing else, means that the trial judge's 'ruling will not be reversed simply because an appellate court disagrees.'" *Id.* (quoting Henry J. Friendly, *Indiscretion about Discretion*, 31 Emory L.J. 747, 754 (1982)). "Only when reasonable jurists could not differ can we say an abuse of discretion has occurred." *Id.*

"[L]imitation of cross-examination is within the trial court's discretion." *Castillo v. Commonwealth*, 70 Va. App. 394, 461 (2019) (quoting *Jackson v. Commonwealth*, 266 Va. 423, 438 (2003)). A party is entitled to impeach the credibility of a witness called by the opposing party, including by evidence of prior inconsistent statements, Va. R. Evid. 2:607(v), and by "showing that a witness is biased for or prejudiced against a party," Va. R. Evid. 2:610. "[A] trial court nonetheless 'has discretion to limit the scope of cross-examination which is for the

---

[4] Loftis appears to have confused inconsistent statements with contradiction of Hendley's statements on a collateral matter. "A fact is wholly collateral to the main issue if the fact cannot be used in evidence for any purpose other than for contradiction." *Via v. Commonwealth*, 42 Va. App. 164, 185 (2004) (quoting *Hemlick v. Commonwealth*, 38 Va. App. 558, 564 (2002)). Yet, "[e]vidence of collateral facts, from which no fair inferences can be drawn tending to throw light upon the particular fact under investigation, is properly excluded for the reason that such evidence tends to draw the minds of the jury away from the point in issue, to excite prejudice and mislead them." *Id.* at 185-86 (quoting *Hemlick*, 38 Va. App. at 564-65). Seeking only to contradict Hendley's statements, Loftis's proposed cross-examination was collateral to the main issue, and thus, properly excluded.

purpose of establishing bias.'" *Sheng Jie Jin v. Commonwealth*, 67 Va. App. 294, 309 (2017) (quoting *Norfolk & W. Ry. v. Sonney*, 236 Va. 482, 488 (1988)).

"[W]hen 'determining whether relevant evidence should be admitted, the trial court must apply a balancing test to assess the probative value of the evidence and any undue prejudicial effect of that evidence.'" *Commonwealth v. Proffitt*, 292 Va. 626, 639 (2016) (quoting *McCloud v. Commonwealth*, 269 Va. 242, 257 (2005)); *see* Va. R. Evid. 2:403. "Under this balancing test, relevant evidence will only be excluded when its probative value is 'substantially outweighed' by its unfair prejudice." *Proffitt*, 292 Va. at 639 (quoting Va. R. Evid. 2:403). "'[U]nfair prejudice' refers to the tendency of some proof to inflame the passions of the trier of fact, or to invite decision based upon a factor unrelated to the elements of the claims and defenses in the pending case." *Id.* at 636 (quoting *Lee v. Spoden*, 290 Va. 235, 251 (2015)).

The trial court did not abuse its discretion by determining that the potential for unfair prejudice substantially outweighed the probative value of Loftis's proposed cross-examination. Loftis contends that Hendley's possession of syringes was probative of her bias because she could be motivated to incriminate Loftis to receive favorable treatment from the Commonwealth in her own criminal matters. But the Commonwealth had not brought any charges against Hendley related to the syringes, and Hendley did not know whether the Commonwealth *would* bring any charges in the future. Accordingly, any response Hendley gave regarding future criminal charges would be more likely to confuse or mislead the jury than be probative of bias.

As the trial court noted, Hendley's possession of syringes did not necessarily show that she had recently used drugs. Moreover, any probative value was minimal considering that defense counsel had already extracted multiple, significant admissions from Hendley: she was under the influence of illegal drugs on the night in question, several portions of her preliminary hearing testimony were inaccurate, she had been convicted of shoplifting and felony drug

- 16 -

possession, and she previously told Davis that she "didn't remember anything" because she was "messed up." The jury saw Hendley testify in handcuffs and a jail jumpsuit, and heard her refer to herself as Loftis's "codefendant." Cross-examination about the syringes as suspected drug paraphernalia would have more likely invited the jury's speculation about a collateral matter than added any probative value to its credibility determinations. Indeed, whether Hendley will be charged for a crime connected with her possession of syringes is a matter of pure speculation; mere possession was not sufficient to justify Loftis's proposed impeachment. Accordingly, the trial court did not abuse its discretion by sustaining the Commonwealth's objection to Loftis's cross-examination.

### III. The trial court did not err in denying Loftis's motion for a mistrial.

#### a. *Background*

After the trial court impaneled the jury, Loftis moved for a mistrial. Defense counsel advised the trial court that before it came to order and while the venire panel was present in the courtroom, counsel discussed Loftis's "mask availability" with the courtroom deputies. According to counsel, during this conversation the deputies "quite audibly" questioned "who ha[d] keys." Although defense counsel did not "know what was heard or inferred from" this discussion of keys, counsel believed that the venire panel "may have heard something that [they] shouldn't have." Defense counsel moved for a mistrial. The prosecutor opposed the motion, asserting that there was "no evidence anyone heard anything." The prosecutor noted that defense counsel did not voir dire the jury panel on this question. The trial court denied Loftis's motion for a mistrial, noting, "we all have keys to get in here . . . . I mean I have an electronic fob and I mean there are lots of locked doors around here[.]" The trial court found that Loftis could receive a fair trial.

b. *Analysis*

Loftis argues that the trial court abused its discretion by denying his motion for a mistrial based on the courtroom deputies' purported comments about keys. Specifically, Loftis contends that he was entitled to a mistrial because the jury may have heard courtroom deputies discussing keys, thus impermissibly inferring that he was in custody.

"[W]e review [the] denial of a motion for a mistrial for abuse of discretion." *Bethea v. Commonwealth*, 68 Va. App. 487, 500 (2018) (second alteration in original) (citation omitted). A trial court is authorized to declare a mistrial by discharging a sworn jury when "there is a manifest necessity for such discharge." Code § 8.01-361. When a defendant moves for a mistrial, "[t]he trial court must make an initial factual determination, in the light of all the circumstances of the case, whether the defendant's rights had been so indelibly prejudiced as to require a new trial." *Castillo*, 70 Va. App. at 445 (quoting *LeVasseur v. Commonwealth*, 225 Va. 564, 589 (1983)). "Unless we can say as a matter of law that this determination was wrong, it will not be disturbed on appeal." *Id.* (quoting *LeVasseur*, 225 Va. at 589).

The record does not indicate that any member of the venire panel heard the deputies' conversation or, if they did hear it, understood it. During the voir dire, defense counsel did not ask the venire panel whether anyone heard the conversation. Nor did defense counsel request that the trial court issue a curative jury instruction. Moreover, the trial court found that the references to keys were not inherently prejudicial to Loftis because such references did not necessarily indicate Loftis's custodial status. Given that Loftis's assertion of any prejudice—let alone indelible prejudice—was wholly speculative, he failed to show that there was a manifest necessity to discharge the jury. Thus, the trial court did not abuse its discretion in denying Loftis's motion for a mistrial.

## IV.  Revocation Order

In a separate revocation order, and based in part upon the new convictions, the trial court revoked Loftis's previously suspended thirty-year sentence, reimposed that sentence, and resuspended all but three years, for an active three-year revocation sentence.  Loftis argues that if this Court reverses any of his convictions, we should also reverse the trial court's order revoking his suspended sentence.  Because we affirm Loftis's convictions, we need not further address this assignment of error.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court, and remand for the limited purpose of correcting a clerical error in the final sentencing order.

*Affirmed and remanded.*